# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 23-1141V
UNPUBLISHED

|  |  |
|---|---|
| DOROTHY CHRISTINE COLEMAN, | Chief Special Master Corcoran |
| Petitioner, | Filed: September 5, 2025 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Koby Jack Kirkland, Law Office of Koby Kirkland, LLC, Mobile, AL, for petitioner.*

*Katherine Edwards, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

On July 24, 2023, Dorothy Christine Coleman filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered from Guillain Barré syndrome ("GBS") caused by an influenza ("flu") vaccine administered on August 24, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"), and although entitlement was found in the Petitioner's favor, the parties could not agree to damages.

---

[1] Because this unpublished fact ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the fact ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below, I award **$130,000.00** in damages, representing compensation for actual pain and suffering.

## I.      Relevant Procedural History

This case was initiated on July 24, 2023. On April 5, 2024, Respondent filed a Rule 4(c) Report recommending compensation because Petitioner satisfied the Table criteria for a flu-GBS claim. ECF No. 20. A ruling on entitlement was entered on April 17, 2022. ECF No. 21. The parties were unable to resolve damages, and Petitioner filed a motion for a ruling on the record on July 22, 2024. Petitioner's Motion for Ruling on the Record as to Damages ("Mot."), ECF No. 28. Respondent filed a response on September 4, 2024. Respondent's Responsive Brief on Damages ("Res."), ECF No. 29. Petitioner filed a reply on September 11, 2024. Petitioner's Reply to Respondent's Response to Petitioner's Motion for Ruling on the Record as to Damages ("Reply"), ECF No. 31.

## II.     Petitioner's Medical Records

Ms. Coleman was sixty-two when she received a flu vaccine on August 24, 2020. Ex. 2 at 2. Prior to her vaccination, Petitioner's medical history included congestive heart failure, Bell's palsy, anxiety, depression, skin cancer, and memory loss, among other conditions. Ex. 3 at 408. Prior to her vaccination, she also sought care for concerns that her musculature was "shrinking" on the right side of her face, and she was increasingly aware of a drooping right eyelid and asymmetric smile. Ex. 16 at 1, 4, 6. An examination showed Petitioner's nasal labial groove was not as deep on the right side, and asymmetry was noted when she grimaced. *Id.* at 4.

On September 13, 2020, Petitioner complained of bilateral numbness in her feet and hands, knee and hand pain, and weakness that began two days earlier. Ex. 3 at 466. She also reported poor balance and three falls. *Id.* at 472-73. Petitioner asked to be admitted to the hospital, but was refused because at that time she could walk without difficulty. *Id.* at 459-61.

Petitioner was visited by Ochsner Home Health on September 18, 2020, due to "new onset/exacerbation of decreased [bilateral lower extremity] strength and unsteady gait." Ex. 6 at 17. She required the use of a walker or wheelchair, and at that time it was a "normal inability to leave home." *Id.* at 20.

On September 19, 2020, Petitioner complained of generalized weakness and inability to walk for one week at Our Lady of the Lake regional Medical Center Hospital. Ex. 4 at 106. She also reported having fallen multiple times in the past week. Ex. 4 at 121.

The record notes that Petitioner "has a slight right facial droop due to previous Bell's palsy." *Id*. An MRI showed degenerative changes with stenosis, and she was admitted for further evaluation. *Id.* at 121.

Petitioner was evaluated by a neurologist on September 20, 2020, who noted her ten-day history of painful neuropathy, progressive ascending weakness, areflexia "in the setting of a viral illness and receiving the flu and zoster vaccine 1 month ago…." Ex. 4 at 146-47. The record notes that Petitioner has a history of Bell's palsy and chronic right facial weakness. *Id.* at 147. Gabapentin was prescribed and she was evaluated by occupational and physical therapy. *Id.* at 154, 56. Her pain was reported as 6/10, and she was assessed with decreased strength, endurance, coordination, and balance. *Id.* at 154. An MRI was unremarkable, but a lumbar puncture on September 21 was consistent with GBS. *Id.* at 166, 170. Additionally, Petitioner injured her ankle when transferring from a wheel chair to her bed on September 21, 2020, which impacted her course of physical therapy. *Id.* at 176, 184.

Between September 21 and 25, 2020, Petitioner completed five IVIG infusions. Ex. 4 at 140. She was then able to walk without assistance (Ex. 4 at 140) and transferred to inpatient rehabilitation at Lane Regional Medical Center. Ex. 5 at 13, 17. Three days into rehab, she expressed a desire to be discharged, stating she can "take care of myself at home and I am ready to be discharged." *Id.* at 185. Petitioner was discharged on September 28, 2020. *Id.* At that time, she was reliant on a cane or walker but was progressing back to baseline status with no reports of incontinence or urinary retention. *Id.* at 185-187.[3] Her diagnoses included GBS, hyperlipidemia, left ankle sprain, and hypothyroidism. *Id.* at 185.

Petitioner was seen five times by an occupational therapist (Ex. 6 at 169), seven times by a physical therapist (Ex. 6 at 137), and by home health nurses between September 30 and October 16, 2020. Ex. 6 at 6, 21. During that time, she reported decreasing pain levels (Ex. 6 at 123, 74, 154-55, 133, 164, 168 (noting pain levels decreased from 8/10 to 6/10)), improved balance, and increasing endurance. *Id.* at 76, 132, 159. She also reported incontinence twice. *Id.* at 63, 74. By October 16, Petitioner's therapy was discontinued because she had met her goals, and she denied any pain. *Id.* at 80, 87, 137, 169.[4] However, she was still classified as a moderate fall risk and reported bilateral extremity aching and pain. *Id.* at 140, 168.

---

[3] A therapy note from September 26, 2020, also noted Petitioner was independent in toileting.

[4] Petitioner states she was discharged from her home health care after receiving notice that Medicare would not pay after October 16, 2020. Ex. 6 at 8.

On November 2, 2020, Petitioner was seen at a neurology follow-up, reporting substantial improvement and 75% strength return. Ex. 9 at 23. She continued to use a cane due to sometimes feeling wobbly and numb feet. *Id.* Petitioner also reported "preexisting stress incontinence" that was now worse, and a racing heart. *Id.* She was encouraged to consult with urology and a cardiologist, but no such records were filed. *Id.* at 38.

Petitioner was assessed at an outpatient clinic on February 4, 2021. Ex. 3 at 314-15. She was diagnosed with lumbar facet arthropathy, lumbar spondylosis, and chronic lower back pain from a car accident in the 1980's that "comes and goes". *Id.* at 314-15. The back pain flared up following her GBS and was rated as 4/10. *Id.* at 316. Physical therapy was recommended, and she completed four sessions ending on March 3, 2021. *Id.* at 247, 257, 317. By March 3, Petitioner reported improved endurance and strength, and the ability to preform household tasks without increased symptoms. *Id.* at 247.

On August 12, 2021, Petitioner saw a neurologist with complaints of constant numbness and tingling. Ex. 9 at 27. She also stated that her incontinence had gotten "a little worse" following her GBS, but the medication she was receiving improved her symptoms. *Id.* Additionally, she explained her gait and balance had improved and she was exercising a few days a week. *Id.* The neurologist concluded that Petitioner had "[o]verall recovered pretty well from GB[S]". *Id.* at 31. However, she continued to demonstrate slow gait and mild bilateral lower extremity weakness. *Id.*

Petitioner was seen by a plastic surgeon on November 4, 2021, for a concern of asymmetry on the right side of her face affecting her eye and mouth that had occurred over the past several years. Ex. 8 at 28. She noted that she had GBS previously but had fully recovered with no issues involving her face. *Id.* Petitioner was assessed with facial spasticity, synkinesis, and blepharospasm. *Id.* at 31.

Petitioner returned to neurology on February 15, 2022, with a "kinda new problem" of shooting pain in her head that began six to seven months earlier. Ex. 9 at 15. She also reported receiving therapy for right facial weakness she claimed was from her GBS. *Id.*

On April 22, 2022, Petitioner obtained treatment related to her facial symptoms including Botox. Ex. 10 at 10. The physician stated that Petitioner's "level of brow asymmetry can be attributed to premorbid v [Bell's palsy] confounded with blepharospasm." *Id.* at 11.

Petitioner was seen at an eyelid cosmetic surgery center on August 4, 2022. Ex. 17 at 14. She stated the Botox injections helped and recalled her history of Bell's Palsy

in 2015 and a droopy right upper lid two years prior. *Id.* A few days later, a treater noted she had no issues with her face during her GBS and attributed her symptoms to Bell's Palsy. Ex.10 at 12. Botox was administered at that visit, and on three subsequent occasions between October 18, 2022, and April 20, 2023. Ex. 10 at 14, Ex. 17 at 11-13.

On June 1, 2023, Petitioner had additional treatment related to Bell's Palsy. She was assessed with presumed Bell's Palsy, right facial spasticity, synkinesis, and blepharospasm. Ex. 18 at 53. Petitioner also reported she was seeing another physician for cosmetic work, and that she "[l]ikes eye open but brown arch is different and concerned about smile. Wants surgery". *Id.* She returned two times in 2023 for Botox injections.

On February 7, 2024, Petitioner obtained more Botox injections, reporting that was the only thing that controlled her facial spasms. Ex. 17 at 9. She received a quote for surgeries including bilateral blepharoplasty, internal ptosis, and horizontal shortening, which were scheduled for September 7, 2024. *Id.* at 4, 6.

### III.    Affidavit Evidence

Ms. Coleman submitted an affidavit in support of her petition describing the onset and treatment of her GBS, as well as her recovery. Ex. 13. She also noted her previous history of Bell's Palsy in 2017, and its return after her GBS. *Id.* at 5. Additionally, Petitioner stated that she previously had "minor stress urinary incontinence" that worsened after her GBS. *Id.*

### IV.    Damages

The contested damages component to be decided are past pain and suffering, future pain and suffering, and out-of-pocket expenses. Petitioner requests an award of $245,000.00, comprised of $219,517.94 for past pain and suffering, $1,000 a year for future pain and suffering, $105.00 for out-of-pocket expenses, and $9,650.00 to cover the cost of a blepharoplasty. Mot. at 20-21. Respondent argues that an award of $125,500.00 for pain and suffering is reasonable in this case. Res. at 21-22.

### V.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such

expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum (between zero and the $250,000.00 cap), that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The Court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead,

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

pain and suffering should be assessed by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. While *Graves* does not control the process used herein to calculate pain and suffering, it stands as wise counsel.

## VI.    Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact the awareness of her injury. Therefore, my analysis focuses primarily on the severity and duration of Petitioner's injury. When performing this analysis, I review the record as a whole, including the medical records and affidavits filed and all assertions made by the parties in written documents.

### A.  Past pain and suffering

Petitioner requests $219,517.94 for past pain and suffering. She cites to a number of damages decisions involving GBS injuries.[6] Mot. at 16-21. Petitioner also noted that awards in proffered GBS cases typically range from approximately $125,196.11 and the cap. *Id.* at 20. Respondent recommends the lower sum of $125,500.00. Res. at 21-22. He argues that Petitioner's course was less severe than previous cases where damages had to be decided, and that she has not established her facial symptoms or incontinence were caused by, or substantially aggravated by, her GBS. Res. at 12-21.

After reviewing the record in this case and considering the parties' written arguments I find that the record best supports the conclusion that Petitioner suffered a moderate case of GBS, with treatment that was not exceedingly intrusive compared to other case.

The majority of Petitioner's treatment occurred in September and October 2020 – very close-in-time to her vaccination. On September 13th, Petitioner reported bilateral numbness and weakness for two days and multiple falls. Ex. 3 at 466, 472-73. Petitioner

---

[6] In particular, Petitioner cited to *Schenck v. Secretary of Health & Human Services*, No. 21-1768V, 2023 WL 2534594 (Fed. Cl. Feb. 20, 2023) (awarding $150,000 for pain and suffering); *Johnson v. Secretary of Health & Human Services*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000 for pain and suffering); *Fedewa v. Secretary of Health & Human Services*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. 2020) (awarding $180,000 for pain and suffering); and *Dillenbeck v. Secretary of Health & Human Services*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) (awarding $170,000 for pain and suffering).

again complained of generalized weakness and was admitted to the hospital on September 19, 2020, approximately four weeks post-vaccination. Ex. 4 at 106. A lumbar puncture on September 21st was consistent with GBS. *Id.* at 166, 170. Thereafter, Petitioner received five IVIg infusions and was then transferred to an inpatient rehabilitation center. Ex. 5 at 13, 17. She was discharged on September 28, 2020, after a three-day stay at an inpatient rehabilitation facility. *Id.* at 185. At discharge, Petitioner was reliant on a cane or walker, but was progressing back to baseline with no reports of incontinence. *Id.* at 185-87.

Petitioner was seen seven times for at-home physical and occupational therapy sessions between September 30 and October 16, 2020, as well as by a home health nurse. Ex. 6 at 6, 21, 137, 169. During that time, she continued to improve. By October 16th, Petitioner therapy was discontinued, and she had reportedly met her goals. *Id.* at 80, 87, 137, 169. By November 2, 2020, Petitioner reported to her neurologist that she had substantially improved and 75% of her strength had returned. Ex. 9 at 23.

Petitioner's overall treatment was less severe than other GBS cases. She was diagnosed fairly soon after her vaccination, had a relatively short five-day hospitalization, a three-day inpatient rehabilitation stay, a lumbar puncture, five IVIg infusions, and relatively few initial physical and occupational therapy sessions. Petitioner did report some lingering effects such as numbness and tingling in August of 2021, but was noted as having recovered "pretty well" from GBS at that time. Ex. 9 at 27.

Petitioner argues that her facial symptoms (which she sought treatment for between 2021 and 2024) were caused by or substantially aggravated by her GBS, and damages should cover the recommended surgical blepharoplasty. Mot. at 21, Reply at 4-5. However, the records do not support this claim. Petitioner's Bell's palsy preexisted her GBS. Ex. 16 at 2. Further, her facial droop was consistently attributed to her Bell's palsy and not GBS. *See, e.g.*, Ex. 8 at 28 (noting that Petitioner had GBS previously but had fully recovered with no issues involving her face), Ex. 10 at 11 (attributing facial asymmetry to Bell's palsy); *id.* at 12 (noting Petitioner had no issues with her face during her GBS and attributing her facial symptoms to Bell's palsy). Therefore, Petitioner has not established her facial symptoms are related to her GBS.

Petitioner also argues that her incontinence was caused by or significantly aggravated by her GBS. Mot. at 10-11; Reply at 2-4. Again, the records do not support this claim as they show she had preexisting stress incontinence. Ex. 9 at 33. Further, as Respondent notes, no provider linked her incontinence to her GBS. *See* Res. at 15-16. Therefore, Petitioner has not established that her incontinence was caused by, or significantly aggravated by, her GBS.

I find the damages determinations from other cases where pain and suffering awards ranged from $170,000.00 to $180,000.00 involved more severe cases of GBS, and where the injured parties experienced far worse prognoses subsequent to their initial hospitalizations and could no longer work (or were out of work for several months), attended far more physical therapy visits, and continued to require medication for pain specifically related to GBS. *See, e.g.*, *Johnson,* 2018 WL 5024012, at *7-8 (petitioner participated in forty-five PT sessions; petitioner is no longer able to work the ten-hour school day and had to permanently reduce her hours); *Dillenbeck*, 2019 WL 4072069 at *14 (petitioner was hospitalized for two weeks, required multiple rounds of IVIG, physical therapy, live-in care for five-to-six months, extensive use of Gabapentin, ongoing neurology care, ongoing symptoms of hypersensitivity in her trunk year later, and she was not able to return to work as a vet tech, and she had to take on a less demanding, and lower paying, job.); *Fedewa*, 2020 WL 1915138 at *6 (petitioner participated in outpatient occupational therapy for three months and was unable to drive for his job for three months).

Here, by contrast, Petitioner's recovery was much quicker, and the record does not indicate that she has experienced continued treatments or deficiencies specifically related to her GBS aside from some lingering mild numbness and balance issues. Ex. 9 at 23 (noting 75% strength recover by November 2, 2020); 9 at 27, 31 (noting Petitioner had gait and balance issues but also that she had [o]verall recovered pretty well from GB[S]"). For these reasons, I cannot find that her GBS injury and its sequelae were of such a high severity to justify an award of the magnitude she has requested.

Nevertheless, GBS is a serious and frightening vaccine injury, and Petitioner's pain and suffering award should be calculated with that in mind. Petitioner endured hospitalization, IVIg, and therapy (both physical and occupational) thereafter. Although she could ambulate independently, she required the use of a walker for a period of time and suffered lingering sequela through at least August of 2021.

Petitioner's situation is most similar to the claimant in *Shankar v. Sec'y of Health & Hum. Servs.,* No. 19-1382V, 2022 WL 2196407 (Fed. Cl. Spec. Mstr. May 5, 2022) (awarding $125,000.00 for pain and suffering). That petitioner's GBS was found to be on the moderate end of severity - but she underwent a more intense initial treatment including a eight-day hospitalization stay and nine days at an inpatient rehabilitation facility. *Id.* at *2. The *Shankar* petitioner recovered relatively quickly thereafter, but still had residual symptoms at least one year later. *Id.* Similarly, Ms. Coleman had an initial period of treatment that involved eight days of hospitalization, diagnostic testing, and numerous therapy appointments but experienced significant improvement shortly thereafter.

Balancing the severity of a GBS injury and Petitioner's personal loss against the relatively moderate disease course and treatment requirements, and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$130,000.00** in compensation for actual/past pain and suffering is reasonable and appropriate in this case.

### B.  Future Pain and Suffering

The appropriateness of a future pain and suffering component is also disputed. Petitioner argues that her ongoing GBS symptoms justify an award of $1,000.00 a year for the remainder of Petitioner's life expectancy, amounting to $19,000.00. Mot. 20.

Future pain and suffering awards should be reserved "only for cases where a strong showing is made that the claimant has suffered a permanent disability, or there are other extenuating circumstances that justify inclusion of a future component." *Accetta v. Sec'y of Health & Hum. Servs.*, No. 17-1731V, 2021 WL 1718202, at *5 (Fed. Cl. Spec. Mstr. Mar. 31, 2021). But Petitioner has not shown that any residual symptoms she continues to suffer will have as significant an effect on her in the future. Nor is their evidence in this record of a truly permanent injury disability (beyond the usual lingering sequelae, which I can address, and do, in the size of my award for actual pain and suffering).

Additionally, as discussed above, Petitioner has not established that her facial symptoms and incontinence were caused by, or significantly aggravated by, her GBS. Therefore, an award of future pain and suffering related to treating those conditions would be inappropriate here.

### C.  Out of Pocket Expenses

Petitioner argues that she incurred $105.00 in out-of-pocket expenses for treatment to her facial nerve symptoms. Mot. at 21 (citing Ex. 18 at 75). These costs were for procedures in 2023 and 2024. However, as discussed above, Petitioner has not established that her facial symptoms were caused, or significantly aggravated, by her GBS. Therefore, she is not entitled to these costs.

### Conclusion

For all of the reasons discussed above, and based on consideration of the record as a whole, **I award Petitioner a lump sum payment of $130,000.00 for pain and suffering, in the form of a check payable to Petitioner.**

This amount represents compensation for all items of damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[7]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[7] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by each filing (either jointly or separately) a notice renouncing their right to seek review.